OPINION OF THE COURT
Edward W. McCarty III, J.
In this proceeding to determine the validity of a claim (SCPA 1809), petitioners move for an order (i) granting summary judgment declaring valid and enforceable their claim against the estate and (ii) directing respondents to provide full and complete discovery with respect to the tenants-in-common agreement dated May 25, 1984, and the properties affected thereby, including, without limitation, directing respondents to produce all documents responsive to petitioners’ third notice for discovery and inspection dated September 29, 2009. Respondents cross-move for summary judgment dismissing the petitioners’ claim. The motion and cross motion are decided as set forth below.
Factual Background
This proceeding was commenced by petitioners, Mindy Horowitz and Robert Beer, two of the decedent’s grandchildren, against the decedent’s daughter, Sheila Sosnow Nagler, the husband of petitioner Mindy Horowitz, Robert Horowitz, and the decedent’s grandson, Seth Lieberman, as executors of the estate of Morris Sosnow.
The decedent, Morris Sosnow, died on January 15, 2000, and was survived by his wife, Kate Sosnow, and three children, Bernice Lieberman, Lorraine Sosnow (formerly known, and sometimes hereinafter referred to, as Lorraine Beer) and Sheila Sosnow Nagler. The decedent’s last will and testament dated January 6, 1999 was duly admitted to probate by a decree of this court dated February 15, 2000. Letters testamentary issued to Sheila Sosnow Nagler, Seth Lieberman and Robert Horowitz. The decedent’s net estate is approximately $130,000,000.
*721 The 1972 Agreement
The petitioners’ claim is based upon an agreement executed in 1972 between the decedent and Morton Beer, the former husband of Lorraine Sosnow and the petitioners’ father (hereinafter the 1972 agreement). At the time the 1972 agreement was executed, Morton Beer was the decedent’s son-in-law. The petitioners commenced this proceeding to enforce the 1972 agreement executed by their father and their grandfather. The 1972 agreement provided that the decedent and Morton Beer would each bequeath a portion of their assets to petitioners in their respective last wills. The 1972 agreement specifically provided for mutual agreements as to the disposition of certain property defined as “Donative Property.” Morton Beer’s “Donative Property” is defined in the 1972 agreement as follows:
“The Donative Property of Beer shall mean one-fourth (l/4th) of his net estate at the time of his death, as the term ‘net estate’ is defined in Section 5-1.1 of the Estates, Powers, and Trusts Law of New York, plus testamentary substitutes as that term is defined in sub-paragraph (b) (1) of that section.”
The decedent’s “Donative Property” is defined in the 1972 agreement as follows:
“The Donative Property of Sosnow shall mean:
“5% of the issued and outstanding shares of the capital stock of THE NATIONAL BIRCHWOOD CORPORATION, a Delaware corporation.
“5% of the equity interests held by the partners in BIRCHWOOD ASSOCIATES, a New York partnership.
“5% of the equity interests held by the partners in MS ASSOCIATES, a New York partnership.”
The 1972 agreement further provides that
“[i]n ascertaining or identifying Sosnow’s Donative Property, appropriate adjustment shall be made for stock splits, stock dividends or recapitalizations of said corporation hereafter occurring. If hereafter any part of the Donative Property shall be transferred in an exchange, merger, consolidation or reorganization, the assets received therefor shall be deemed substituted in lieu of the property so transferred.
“In the event that the Donative Property, or any part thereof, shall have been sold, liquidated or *722 otherwise disposed of during Sosnow’s lifetime (other than a disposition described in the subparagraph immediately preceding, and other than a disposition by way of transfer to or for the benefit of the Beneficiaries, or either of them), there shall be substituted in lieu thereof:
“(i) the net proceeds thereof — in the event of sale or liquidation, and/or
“(ii) the value thereof as of the date of such disposition — in the event of other disposition.
“For the purpose of the foregoing subparagraph (ii), ‘value’ shall mean, in the case of the shares, the stockholders’ equity thereof as shown on the books of the corporation, and in the case of the equity interest of either partnership, the capital value thereof as shown on the books of said partnerships.
“(A) In the event that either Beneficiary shall predecease the Testator leaving issue, the property so to be given to such Beneficiary shall be given to such Beneficiary’s issue, in equal shares per stirpes.
“(B) In the event that either Beneficiary shall predecease the Testator without leaving issue, and the other Beneficiary or issue of the other Beneficiary shall survive the Testator, his Donative Property shall be given to the surviving Beneficiary or, as the case may be, to such issue of the other Beneficiary, in equal shares per stirpes.
“(C) If neither Beneficiary, nor issue of either Beneficiary, shall survive the Testator, his obligation to devise and bequeath Donative Property shall be deemed cancelled and of no effect.”
Morton Beer’s Will
The 1972 agreement obligated Morton Beer to bequeath one quarter of his net estate to the petitioners. Morton Beer bequeathed his entire estate to the petitioners in his will dated December 18, 1989.
The Decedent’s Will
Article first of the decedent’s will provides for the payment of all of the decedent’s “just debts and funeral expenses.” Articles second and third of the will provide for the disposition of the decedent’s Kings Point home and all of his tangible personal effects to his wife Kate. Article fourth of the will contains a cash *723 bequest of $500,000 to each of the decedent’s daughters and a cash bequest of $250,000 to each of the decedent’s surviving grandchildren, as well as bequests to other family members.
The decedent’s residuary estate is directed to be held in trust for the benefit of Kate. Upon her death, the trust principal is payable to the decedent’s children and grandchildren in varying percentages. Twenty-four percent of the remainder is to be divided among the decedent’s grandchildren living at the time of Kate’s death. The decedent was survived by seven grandchildren. In addition, the decedent’s grandson, petitioner Robert Beer, is to receive an additional 2% of the remainder if he is living at the time of Kate’s death.
January 1, 1972 Document Signed by Morton Beer and Lorraine Beer
On January 1, 1972, Morton Beer and Lorraine Beer executed a document directed to Birchwood Associates stating that they (i) were partners in the partnership; (ii) held a 10% equity interest; and (iii) desired to split their interest between themselves in equal shares so that each of them individually held a 5% equity interest. An identical document of the same date was signed by Morton and Lorraine and directed to MS Associates.
June 7, 1972 Document Signed by Morton Beer, the Decedent and Kate Sosnow
By agreement dated June 7, 1972, Morton Beer sold his 5% equity interest in Birchwood Associates, MS Associates and National Birchwood Corporation, half to the decedent and half to Kate, for $100,000. The agreement also provided for the discharge of a promissory note from Morton Beer to the decedent in the amount of $78,750.
June 7, 1972 Document Signed by Decedent
The decedent cancelled Morton Beer’s promissory note dated May 16, 1968 in the amount of $78,750 by instrument dated June 7, 1972.
Letter Dated June 7, 1972 from Decedent to Morton Beer
The decedent indemnified Morton Beer for any tax obligation that might have arisen as a result of Morton Beer’s sale of his 5% equity interests to the decedent and Kate in Birchwood Associates, MS Associates and National Birchwood Corporation.
*724 1998 Assignment
By instrument dated October 30, 1998, the decedent assigned one half of his 87% interest in Birchwood Associates to Kate.
Kate Sosnow’s Will Dated May 7, 2001
The decedent’s wife Kate died on December 21, 2001, leaving a will dated May 7, 2001. Kate bequeathed her Florida condominium on Collins Avenue in Miami Beach, Florida to Mindy Horowitz. She also gave 2% of her residuary estate to Robert Beer and 17% of her residuary estate to be divided equally among her surviving grandchildren.
Notice of Claim
On February 18, 2004, petitioners served a notice of claim that there was due and owing them:
“[P]ursuant to an Agreement dated June 7, 1972 between Morris Sosnow and Morton Beer, five percent of the issued and outstanding shares of the capital stock of THE NATIONAL BIRCHWOOD CORPORATION, five percent of the equity interests held by the partners in BIRCHWOOD ASSOCIATES, and five percent of the equity interests held by the partners in MS ASSOCIATES, including appropriate adjustments for stock splits, stock dividends or recapitalizations of said corporation thereafter occurring, or the assets received in any exchange, merger, consolidation, or reorganization of any of the foregoing entities, in accordance with the terms of said Agreement.”
Testimony of Lorraine Sosnow
Lorraine Sosnow testified at her deposition that the decedent had given her and her then-husband, Morton Beer, the equity interests in the two partnerships, MS Associates and Birchwood Associates. She also testified that Morton Beer worked as a building superintendent for the decedent. According to Lorraine, she was present when the 1972 agreement between Morton Beer and the decedent was signed. In 1972, in connection with their divorce, Lorraine and Morton entered into a series of transactions designed to divest Morton of his ownership in the family business. The premise of the 1972 agreement was that Morton would give her father control of Morton’s interest during his lifetime and that, upon her father’s death, those interests would go to the petitioners, the children of the marriage of Lor *725 raine and Morton. Lorraine testified that the intent behind the 1972 agreement was that Morton’s 5% interest would be controlled by the decedent during his lifetime, but ultimately would benefit her and Morton Beer’s children. Lorraine also testified that she spoke to her mother after the decedent’s death when she learned of the provisions in his will. When Lorraine expressed her concern, her mother said something to the effect of “Don’t worry. It will be taken care of.”
Deposition of Roger Stern
Roger Stern, Esq. testified that he represented Morton Beer in connection with the 1972 agreement. According to Mr. Stern, as part of the divorce between Morton and Lorraine, Morton would surrender all of his “shares at a price that Morris stipulated.” He advised Morton that “Birchwood was more than $2 million,” but the decedent
“simply said that’s what I am willing to pay — and Morty’s feeling was that we should go along with it. I mean I — as his counsel. I had to indicate to him that it was worth more than that, I assumed, but that his interest was that as long as his children got it, it wasn’t going to be so terrible to take less value than there was and it was an amicable settlement.”
Mr. Stern further testified that Morton’s feeling was not to get into a “protracted battle” about value if it was going to his children anyway. According to Mr. Stern, the 1972 agreement
“was a negotiated agreement as to details but the concept of the agreement was, basically, dictated by Morris and that he wanted to get it back but he agreed and the agreement was that if he sold the business or one thing or another, that then it would be put into trust. In other words, it would ultimately go to the children but he was not going to give it to the children now. He wanted to get it back.”
Deposition of Stephen J. Schwartz, Esq.
Mr. Schwartz testified that he drafted the decedent’s and Kate’s wills. With respect to all the wills he prepared for them, neither of them ever communicated to him that any of the provisions for Mindy and Robert were in satisfaction of any contractual obligation. Mr. Schwartz testified that, in fact, he did not learn of the 1972 agreement until April 2003, after Kate’s death.
*726 Depositions of the Parties
Sheila Sosnow Nagler testified that she first learned of the 1972 agreement in 2003 when she received a phone call from Stephen Schwartz. Sheila also testified that she never discussed the 1972 agreement with her father or her mother. She confirmed that the decedent had established trusts for petitioners and his other grandchildren.
Seth Lieberman testified that he, too, learned of the 1972 agreement for the first time in May of 2003. He testified that he did not know whether the decedent intended to satisfy his obligation to petitioners through lifetime gifting he had done or the 1998 cash distributions, but he believed that all of those components — gifts under the will, shares of the residuary estate and post-1998 cash distributions and transfers — fully satisfied the claim.
Robert Beer testified that the decedent purchased Robert’s home and then transferred title to Robert. The home cost $700,000. The mortgage was at least 80% and Robert paid the mortgage. Robert worked for the family business at one point.
Mindy Horowitz testified that her grandparents were very generous.
Guardians Ad Litem and Other Residuary Beneficiaries
By decision dated March 31, 2011 (decision No. 27088), this court, recognizing that a determination of this proceeding in the petitioners’ favor would have a negative impact on the residuary beneficiaries, held this proceeding in abeyance pending the issuance of supplemental citations to the residuary beneficiaries who had not been made parties to this proceeding. Thereafter, by decision dated November 3, 2011 (decision No. 27552), a guardian ad litem was appointed for Jennifer Lieberman and Madison Beer, two minor remaindermen of the trust created for the benefit of Kate Sosnow. Noting that there might be a conflict between the two minor wards since Madison Beer is the daughter of petitioner Robert Beer, a separate guardian ad litem subsequently was appointed for Madison Beer.
The guardians ad litem have each filed a report supporting the respondents’ cross motion dismissing the claim. In addition, counsel for Bernice Lieberman, Daryl Lieberman and Zabrina Lieberman has also submitted an affirmation in support of the cross motion and in opposition to the motion.
*727 Motion and Cross Motion for Summary Judgment
Summary judgment may be granted only when it is clear that no triable issue of fact exists (see e.g. Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]; Phillips v Kantor & Co., 31 NY2d 307, 311 [1972]). The court’s function on a motion for summary judgment is “issue finding” rather than issue determination (Sillman v Twentieth Century-Fox Film Corp., 3 NY2d 395, 404 [1957]), because issues of fact require a hearing for determination (Esteve v Abad, 271 App Div 725, 727 [1st Dept 1947]). Consequently, it is incumbent upon the moving party to make a prima facie showing that he is entitled to summary judgment as a matter of law (CPLR 3212 [b]; Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067 [1979]; Zarr v Riccio, 180 AD2d 734, 735 [2d Dept 1992]). If there is any doubt as to the existence of a triable issue, the motion must be denied (Hantz v Fishman, 155 AD2d 415, 416 [2d Dept 1989]). The court should view the evidence in the light most favorable to the non-moving party and give the non-moving party the benefit of all reasonable inferences which can be drawn from the evidence (Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt, L.P., 7 NY3d 96, 105-106 [2006]).
If the moving party meets his or her burden, the party opposing the motion must produce evidentiary proof in admissible form sufficient to establish the existence of a material issue of fact that would require a trial (see Zuckerman v City of New York, 49 NY2d 557, 562 [1980]). In doing so, the party opposing the motion must lay bare his or her proof (see Towner v Towner, 225 AD2d 614, 615 [2d Dept 1996]). “[M]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient” to overcome a motion for summary judgment (Zuckerman v City of New York, 49 NY2d 557, 562 [1980]; see Prudential Home Mtge. Co. v Cermele, 226 AD2d 357, 357-358 [2d Dept 1996]). The court must deem the allegations made in the pleadings and affidavits to be true, should not determine credibility, and should merely determine whether there is a genuine issue of fact (S.J. Capelin Assoc. v Globe Mfg. Corp., 34 NY2d 338 [1974]). Although the court must evaluate whether the alleged factual issues presented are genuine, the matter should be resolved summarily only when the contrary facts are unsubstantiated (Andre v Pomeroy, 35 NY2d 361 [1974]).
In connection with a claim for breach of contract, a plaintiff demonstrates a prima facie entitlement to summary judgment *728 by establishing the existence of the contract, plaintiffs performance thereunder, and nonperformance by the defendant (Carltun on Bay Kosher Caterers v Makani, 295 AD2d 464 [2d Dept 2002]).
Petitioners’ Argument
Petitioners’ motion for summary judgment is supported by the affirmations dated April 12, 2010, September 24, 2010, September 7, 2011 and November 14, 2012 of petitioners’ counsel. Petitioners argue that summary judgment should be granted because they have (i) authenticated the 1972 agreement; (ii) demonstrated Morton Beer’s performance under the 1972 agreement; and (iii) demonstrated the decedent’s nonperformance under the 1972 agreement. Petitioners argue that there is “not one scintilla of evidence” that decedent satisfied his obligations under the 1972 agreement by the provisions of his will. Petitioners claim that the will is devoid of any language whatsoever expressing any intention on behalf of the decedent that the legacies to petitioners thereunder be deemed in satisfaction of his obligation under the 1972 agreement. Petitioners also claim that the testimony supports the fact that no one involved in the decedent’s estate planning was even aware of the 1972 agreement until after the decedent’s death. Specifically, petitioners rely on the testimony of Mr. Schwartz that he had no knowledge of the 1972 agreement when he drafted the decedent’s will. Neither Sheila Sosnow Nagler nor Seth Lieberman, who were designated by decedent to handle his estate as the nominated fiduciaries under his will, had any knowledge of the 1972 agreement until Mr. Schwartz so advised them in a telephone conversation after Kate’s death.
Moreover, petitioners argue that the legacies for petitioners in the decedent’s will are significantly different than the provisions the decedent was obligated to make under the 1972 agreement. Petitioners note that it was not certain that they would inherit anything under the decedent’s will since the will provided that they had to survive the decedent in order to inherit their pre-residuary $250,000 cash legacy and survive Kate in order to inherit their share of the residuary trust for her benefit. Under the 1972 agreement, however, decedent’s obligation was not conditioned upon either of petitioners surviving him. Pursuant to the 1972 agreement, if either petitioner did not survive the decedent, his or her issue would receive such beneficiary’s respective share of the Donative Property. The *729 decedent’s will did not provide for a gift over to petitioners’ issue in the event either of them did not survive. Petitioners further contend that the decedent was obligated to make an “in-kind” specific disposition in his will of 5% of the subject entities in equal shares to the petitioners, whereas the pre-residuary general legacy for the benefit of all of the decedent’s surviving grandchildren and percentage interests in the residuary trust are of a different nature. The petitioners assert that, since the decedent’s obligation was unliquidated when he executed his will, absent a specific in-kind disposition of the Donative Property, the decedent could not have known what the value of 5% of the subject entities would be when he died. Accordingly, the decedent could not have known whether the cash bequest and remainder interests would satisfy his obligation to petitioners.
In addition, petitioners claim that the language in article first of the will directing the payment of all of the decedent’s debts prior to provision for the legacies negates any evidence that the decedent intended any of the legacies to petitioners to be deemed in satisfaction of his obligation under the 1972 agreement. Lastly, petitioners claim that the decedent clearly knew how to express his intention when he desired, as shown by the language in his will regarding the bequest for his daughter, Bernice Lieberman. Article fifth (C) (1) of the decedent’s will provides, “I have made the provision in paragraph C.l. hereof for my daughter BERNICE LIEBERMAN, after having given due consideration for provisions made for her or her benefit during her lifetime.”
Respondents’ Argument
Respondents oppose the motion for summary judgment and cross-move for dismissal of petitioners’ claim. In opposition to the motion and in support of the cross motion, respondents submit an affirmation of respondents’ counsel, Alison J. Page, Esq., dated November 23, 2010; a supplemental affirmation of Alison J. Page, Esq., dated January 25, 2011; the affirmation of their counsel, Robert N. Schwartz, Esq., dated September 16, 2011; the affidavit of Sheila Sosnow Nagler, and the affidavit of Michael Zivotovsky, the decedent’s accountant. Respondents argue that the petitioners’ claim is “premised on several unsubstantiated notions” and that petitioners are trying to effectively double their legacy. Respondents further claim that petitioners’ theory is not based on the language of the 1972 agreement, but rather is based entirely on their mother Lor *730 raine Sosnow’s incorrect interpretation of the 1972 agreement that her children should receive more than the decedent’s other grandchildren. Specifically, respondents argue that the 1972 agreement simply created “a floor to ensure that petitioners would receive at least a certain share of the decedent’s estate; it never guaranteed that they would receive more than his other grandchildren. ’ ’
Respondents also claim that Morton Beer did not have to sell his 5% interest outright to the decedent and Kate; he could have held onto it. Instead, he chose to sell his interest in exchange for compensation in excess of $178,750. Respondents argue that the compensation Morton received was the true consideration for the 1972 agreement rather than the decedent’s promise to bequeath his Donative Property to Morton’s children.
According to respondents, the decedent’s promise to “devise and bequeath” the Donative Property could be fulfilled as a specific bequest or as a bequest of a portion of the residuary estate or a lifetime gift or an insurance policy designation. The respondents claim the 1972 agreement gave the decedent tremendous flexibility in deciding how to fulfill his promise. Moreover, they contend that no “right words” were required to be used by the decedent in order to meet his obligation. Respondents argue that petitioners’ theory imposes a different standard for determining whether the decedent met his obligation than the standard by which they judge Morton Beer’s performance. Even though Morton Beer’s last will did not include language specifically referencing the 1972 agreement, petitioners still claim he met his obligation.
Respondents assert that decedent met his obligations under the 1972 agreement by bequeathing to petitioners “everything that they were entitled to and more.” According to respondents, before and after his death, the decedent gave the petitioners multiple times the value to which they were entitled to receive. Respondents also claim that by a pro rata distribution of the residuary estate, Robert will receive a 2.36% interest in each of the Birchwood entities and Mindy will receive a 1.49% interest, without even taking into account the provisions in Kate’s will. Since the decedent’s will specifically empowers his executors to distribute the assets in his residuary estate on an in-kind, non-pro rata basis, however, the executors have the ability to give petitioners 2.5% of each of the Birchwood entities and a smaller share of the other assets in the decedent’s residuary estate, and, *731 thereby can effectuate the terms of the 1972 agreement. The respondents point out that, under the decedent’s will, Robert receives 5.43% of the trust remainder and Mindy receives 3.43%. Due to the proximity of the decedent’s and Kate’s deaths, the trust for Kate’s benefit was never, in fact, funded.
In addition, respondents claim that the decedent’s and Kate’s estate plans should be viewed together and that the equity of the Birchwood entities left to petitioners under Kate’s will should also count towards satisfaction of the 1972 agreement. Respondents argue that Morton Beer sold half of his equity to each of the decedent and Kate. Also, the testimony of both petitioners and respondents supports the idea that the decedent and Kate operated as a single unit in all aspects of their lives. Respondents contend that on a pro rata distribution under both wills, Robert will receive 4.29% of equity in the Birchwood entities and Mindy will receive a 2.55% interest, thereby satisfying the 1972 agreement’s promised bequest.
Additionally, the 1972 agreement includes a “substitution” provision in the definition for the decedent’s Donative Property which respondents argue allowed the decedent to substitute other assets if he decided to sell or dispose of his equity interest. Respondents claim that the decedent triggered the substitution provision in the 1972 agreement on October 30, 1998 when he transferred approximately half of his equity interest in each of the Birchwood entities to Kate. As a result of the 1998 transfer, the decedent was “entitled” to satisfy his obligation by a bequest in an amount equal to the book value of a 5% interest in the Birchwood entities on the transfer date. Immediately after the 1998 transfer, the decedent set up a trust for Mindy, with $171,428, and a trust for Robert, with $251,432, in the context of a transaction creating the Sosnow Family Limited Partnership. When the decedent sold limited partnership interests, Mindy’s trust received an additional gift of $305,828 and Robert’s trust received an additional gift of $448,550. The decedent’s 1999 amended gift tax return shows additional gifts to Mindy of $81,725 and to Robert of $17,000.
The respondents also claim that the case law petitioners rely upon is inapplicable because a promise to bequeath is different than a creditor’s claim for unpaid services. According to respondents, petitioners are merely third-party beneficiaries, not creditors.
Respondents submit that the claim was satisfied for all the reasons set forth above. Alternatively, respondents argue that, if *732 it is determined the decedent did not satisfy the claim, the bequests under the will should be applied to the obligation under the doctrine of partial performance.
Petitioners’ Reply
Petitioners argue that the issues raised by respondents are simply “red herrings” designed to distract the court from the real issue, which is whether the decedent intended the legacies to petitioners in his will to satisfy his obligation to petitioners under the 1972 agreement. Concerning respondents’ claim that petitioners are applying a different standard to determine whether Morton Beer’s will fulfilled his obligation to bequeath one quarter of his net estate to his children, petitioners point out that language is just one factor to consider in determining the testator’s intent. According to petitioners, respondents incorrectly assert that petitioners’ theory is that specific language must be used in order to find that the testator intended the legacy to satisfy the bequest. Petitioners note that, here, Morton Beer did more than the 1972 agreement required him to do; he left his entire estate to his children. There can be no question as to whether Morton Beer intended the bequest to petitioners in his will to satisfy his obligation under the 1972 agreement because there was nothing more for him to give. By virtue of the definition of Morton Beer’s “Donative Property” and the provision in his will, any other conclusion would be “untenable” under the Friedman standard respondents rely upon (Matter of Friedman, 146 Misc 2d 91, 97 [Sur Ct, NY County 1989]).
Similarly, petitioners dispute the idea that Kate Sosnow’s will should also be considered in determining whether the decedent satisfied his obligation. The 1972 agreement was an agreement between the decedent and Morton Beer. Kate was not a signatory to the 1972 agreement, although petitioners acknowledge that she did execute ancillary documents to the transaction. Respondents argue that, by both petitioners’ and respondents’ accounts, Kate and the decedent operated as one unit in all aspects of their lives, and, therefore, the dispositions for petitioners in Kate’s will should be taken into account. The 1972 agreement provides that “Sosnow agrees that upon his death his Last Will and Testament shall provide that his Donative Property shall be devised and bequeathed to the Beneficiaries in equal shares” (emphasis added). The language of the 1972 agreement is clear in the sense that it obligated the *733 decedent to fulfill his obligation. Moreover, respondents would be required to demonstrate that Kate intended the bequests to the petitioners in her will to satisfy the decedent’s obligation, which they have not done. After the decedent’s death, Kate actually reduced the percentage of her residuary estate going to her surviving grandchildren, and, therefore, to petitioners, while increasing Lorraine’s share of the residuary. Kate took away 7% of the residuary estate passing to her grandchildren and increased Lorraine’s share from 20% to 27% thereby discrediting respondents’ argument that “Kate took care of it.”
With respect to the issue of whether the substitution provision was triggered by the 1998 transfer by the decedent of one half of his 87% interest in the Birchwood entities to Kate, the petitioners argue that the decedent’s interest in the subject entities was greater than 5% even after the transfer and, therefore, the substitution provision was not triggered. The 1972 agreement obligated the decedent to bequeath 5% of the Birchwood entities to the petitioners; the 1972 agreement did not require the decedent to segregate and bequeath a certain 5% interest. According to petitioners, the substitution provision, which would require the decedent to bequeath to petitioners only the book value in 1998, would only be triggered if the decedent’s retained interest in the Birchwood entities after the transfer was less than 5%. Moreover, petitioners contend that the transfer to Kate was simply a transfer for estate planning purposes, and was not the type of transfer intended to trigger the substitution provision.
Petitioners assert that they are entitled to both their testamentary bequests and the Donative Property because respondents have failed to lay bare any evidence regarding a contrary intention on the part of the decedent.
Applicable Law
As third-party beneficiaries of the contract, petitioners have standing to enforce the contract against the estate (Simonds v Simonds, 45 NY2d 233 [1978]; Matter of Revson, 86 AD2d 872 [2d Dept 1982]). In fact, as third-party beneficiaries of the 1972 agreement, petitioners are contract creditors of the estate (Matter of Friedman, 146 Misc 2d 91, 94 [1989]).
The law is well-settled that “[a] legacy from a debtor to a creditor will be considered in satisfaction of the debt if the testator intended it to be” (Matter of Revson, 86 AD2d 873, 874 [2d Dept 1982]; see also Matter of Friedman, 146 Misc 2d 91, 96 *734 [1989]; Matter of Schuster, 123 Misc 314, 316 [Sur Ct, Westchester County 1924]; Matter of Snell, 40 AD2d 33 [3d Dept 1972]; Matter of Ball, 221 App Div 228 [2d Dept 1927]; Matter of Herb, 163 Misc 441 [Sur Ct, NY County 1937]; Matter of Marshall, 119 Misc 407 [Sur Ct, Westchester County 1922]). As this court stated in Matter of Miller (12 Misc 2d 443, 445 [Sur Ct, Nassau County 1958]),
“[w]hether a legacy to a creditor of the decedent is in satisfaction of a debt is a question of intention of the testator. The legacy will only be deemed in satisfaction of the debt where it is clear from the face of the will and the facts of the particular case that the testator so intended.”
The intention of the testator controls (11 Warren’s Heaton, Surrogate’s Court Practice § 194.06 [7th ed 2012]).
Under the usual rule, in the absence of a contrary intent on the testator’s part, a legatee, who is also a creditor, may have both the legacy and the claim (Matter of Ball, 221 App Div 228 [2d Dept 1927], affd 247 NY 533 [1928]; Matter of Blanch, 126 Misc 421 [Sur Ct, Clinton County 1926]; Matter of Marshall, 119 Misc 407 [1922]). The language of the will is of primary and great import in analyzing a testator’s intention. A testator who intends to fulfill his obligation by a bequest in his will can easily recite his intent to do so in his will, and in the absence of language in the will affirmatively showing the claimed intention, the burden of establishing such intention is on the party seeking to effectuate it (Matter of Revson, 86 AD2d 872, 875 [2d Dept 1982]). Concerning the use of extrinsic evidence as an aid in searching for the testator’s intent, extrinsic evidence has been allowed to a limited extent. As the court noted in Matter of Pergament (204 Misc 384, 386 [Sur Ct, NY County 1953]), “[t]he use of extrinsic evidence in aid of a search for an intent that a legacy shall be in satisfaction of or in addition to a debt is a question upon which there has been divergence of authority and little attempt to reconcile decisions.” In that case, the court was faced with the question of whether a testamentary bequest of $5,000 to the testator’s wife in lieu of all statutory rights in his estate satisfied a provision in an antenuptial agreement that provided that the testator would bequeath the sum of $5,000 to his wife in full satisfaction of any claims the wife may have had to dower. The court stated extrinsic evidence
“will be received and considered to the extent it discloses circumstances surrounding the prepara *735 tion of the will and the relationship between the will and the antenuptial agreement, but not to the extent that such evidence purports to represent direct statements of intention by the testator as to the matters here in issue” (Matter of Pergament, 204 Misc 384, 386-387 [1953]).
There are a number of cases which have addressed the issue of whether a legacy to a creditor satisfies the testator’s obligation and the courts therein articulated factors to be considered in determining what the testator intended. In Matter of Schuster (212 App Div 885 [2d Dept 1925]), the Second Department modified the holding of the Westchester County Surrogate and concluded that the Surrogate’s Court erred in its finding that the testator intended that a legacy to his widow would operate to extinguish her claim under a promissory note. In Matter of Schuster (123 Misc 314 [1924]), the Surrogate’s Court was asked to construe the decedent’s will. The third paragraph of the will gave the decedent’s wife a legal life estate in real and personal property for her support and maintenance. The will provided that “[t]his bequest to my said wife ... is made to her in lieu of her dower and any other rights or claims that she may or can have or make against me or my estate” (id. at 315 [emphasis omitted]). The widow made a claim for money loaned evidenced by a promissory note. The Surrogate found that the testator expressly declared that the bequest was in satisfaction of the debt. The court noted as follows:
“Subject to very numerous exceptions the general rule is that a legacy to a creditor which is equal to, or greater than the debt, will be deemed to be in satisfaction of the debt. The rule is merely a rule of construction giving rise to a presumption and yields to the intention of the testator when otherwise ascertainable. The intention of the testator must prevail in all cases. No presumption arises when a legacy is given in satisfaction of a debt where the will contains a provision for the payment of debts, where an indebtedness is unliquidated, is contracted after the date of the will, or is based on a commercial instrument capable of transfer, where the amount given by the will is less than the amount of the indebtedness” (Matter of Schuster, 123 Misc 314, 315 [1924]).
The Second Department, however, disagreed, finding that the testator could not have intended that the legacy in the will *736 satisfy the debt on the promissory note because the debt to the widow was not even in existence at the time the will was executed.
Similarly, in Matter of Ball (221 App Div 228 [2d Dept 1927]), the Second Department held that the testator’s bequest to the holder of a note on which he was indebted was not evidence of the testator’s intention to satisfy the note. The Court stated as follows:
“Even a bequest to a creditor of a value equal to or greater than the debt is not regarded as a discharge of the debt unless it is apparent on the face of the will itself that such discharge was intended. As was said in Sheldon v. Sheldon (133 N. Y. 1, 4): The legacy given to the plaintiff by the will of the husband did not operate as payment. The will contains no words from which any intent can be inferred or found to extinguish any preexisting debt by means of the bequest. It was an absolute gift apart from any debt due by the testator to his wife, and no debt is even mentioned or referred to in the will. A legacy to a creditor is not to be deemed in satisfaction of his debt, unless so intended by the testator. A legacy implies a bounty and not a payment (Reynolds v. Robinson, 82 N. Y. 103, 107); and when made to a creditor is not to be deemed in satisfaction of his claim unless so intended by the testator (Boughton v. Flint, 74 N. Y. 476, 482; Matter of Dailey, 43 Misc. 552, 558); and where there is a direction in the will for the payment of debts such a direction negatives any intention that the testator was paying a debt by giving a legacy to his creditor (Boughton v. Flint, supra; Matter of Arnton, 106 App. Div. 326, 330; Fort v. Gooding, 9 Barb. 371.)” (Matter of Ball, 221 App Div 228, 234-235 [2d Dept 1927] [internal quotation marks and emphasis omitted]).
The Second Department reasoned that if the testator intended to satisfy his obligation on the note by the bequest, he could have used “suitable expressions to that end, particularly when we consider that the note was made on April 9, 1923, and that the decedent executed his will on April seventeenth thereafter” (Matter of Ball, 221 App Div 228, 235 [2d Dept 1927]).
A few years later, in Vogel v Goldsmith (234 App Div 581, 582 [2d Dept 1934]), the Second Department once again addressed the question and stated as follows:
*737 “The bequests followed a direction of the decedent that his debts should be paid and the bequests were free from any language that justified an inference that they were made in lieu of any obligations of the decedent under his contract with the plaintiffs or that they were made in payment, whole or part, of any such obligations. The bequests were couched in language that resulted in the presumption that they were not in payment of debts but were acts of bounty of the decedent intended as such, apart and distinct from any obligations owing by the decedent to the plaintiffs pursuant to a contract between them. Especially is this so in view of the dissimilarity in the amounts of the bequests and the obligations of the decedent under the contract found to have been made and in view of the obligations of the decedent under that contract not being of an unliquidated character.”
In Matter of Revson (86 AD2d 872 [2d Dept 1982]), under the terms of a separation agreement, the natural father of an infant was required to establish a trust for the benefit of his infant daughter, who was not a party to the separation agreement. The grandfather of the infant guaranteed the natural father’s obligation. The Second Department affirmed the finding of the Surrogate’s Court that the grandfather’s estate was liable to fulfill the guarantee. Although the grandfather had given a legacy to his infant granddaughter in his will, it was held not to be a fulfillment of his son’s obligation. According to the Second Department, if the decedent had intended the legacy to fulfill any prior obligation, he would have recited such intention in his will. As a third-party beneficiary of the guarantee, the infant became a creditor of her grandfather. The Court held that where the language of the will does not affirmatively show the claimed intention, the burden of establishing such intention is on the party seeking to effectuate it, which the executors of the grandfather’s estate failed to do.
In Matter of Snell (40 AD2d 33 [3d Dept 1972]), the Third Department held that specific legacies in the will should not be credited against a claim for care rendered to the decedent before his death. The Third Department held that
“[a] legacy to a creditor is not a satisfaction of the debt unless the testator intends it to be. . . . We conclude the testator intended these legacies as gifts, not compensation. Any presumption that a *738 legacy satisfies a debt is negated where the bequest is less than the debt, where the debt is unliquidated at the time the will was executed, or where legacies are given after payment of all debts. . . . All three circumstances are present in this case. Furthermore, there is no language in the will indicating that the legacies were intended as compensation. It expressly provides that the legacies were made in appreciation of appellant’s ‘kindness’ ” (Matter of Snell, 40 AD2d 33, 33-34 [3d Dept 1972]).
Accordingly, in addition to the language of the will, in determining the testator’s intent the court should consider whether: (i) the claim existed prior to the execution of the will; (ii) there is a provision in the will directing the payment of the testator’s debts; and (iii) the legacy in the will is similar to the obligation. Additionally, the relationship of a legatee to the testator serves as some evidence of his intention. Where a legatee had a claim upon the testator as a natural object of his bounty in addition to his claim of a debt due him, the presumption is that he was intended to have his legacy in addition to his claim (Sheldon v Sheldon, 133 NY 1 [1892]).
Nevertheless, under certain circumstances, the courts have found that the testator, in fact, intended that the legacy satisfy a creditor’s claim. In Steglich v Schneider (66 Misc 390 [Sup Ct, NY County 1910]), the beneficiary made a claim against the decedent’s estate based upon the decedent’s promise to provide a certain sum to the beneficiary in consideration of her act of supporting her husband, the decedent’s son. Article ninth of the decedent’s will stated that, on the death of the decedent’s son, the decedent gave $2,000 from the trust created for her son’s benefit to his wife, Sophie. Article tenth of the will provided:
“The foregoing bequest to my daughter-in-law, Sophie Steglich, is given to comply with a written promise I made to her without my receiving any consideration therefor whatsoever, but because of her persistent solicitation therefor, she having previously paid out certain moneys for her husband, my said son, William Steglich” (Steglich v Schneider, 66 Misc 390, 392 [1910]).
The court found that it was clear from the language of the will that the decedent intended that the legacy was to operate as payment and satisfaction of her obligation to her daughter-in-law.
Likewise, the decedent in Matter of Herb (163 Misc 441 [1937]) entered into a separation agreement with his first wife where *739 he agreed to pay her for her life the sum of $2,400 per year in equal monthly installments of $200 payable on the first day of each month. Under his will, the decedent placed one half of his estate in trust to pay his first wife the sum of $200 per month during her life. The court concluded that there was “little doubt” that it was the intention of the decedent that the bequest satisfy the decedent’s obligation. Similarly, in Matter of Baker (89 NYS2d 56, 59 [Sur Ct, Queens County 1949]), the decedent entered into a separation agreement with his first wife whereby he agreed to pay her $50 per month until their youngest child attained age 21. The decedent’s will provided that the decedent’s residuary estate be held in trust and that the trustees pay the sum of $50 a month to his first wife until his son attained age 21. The court found that the legacy and the obligation were substantially the same. “They are identical in amount and duration. . . . It is evident that testator had the separation agreement in mind when he drew his will and that he intended the legacy . . . as a means of carrying out the continuing obligation of his estate to her . . . .” (Matter of Baker, 89 NYS2d 56, 59 [1949].) Additionally, in Matter of Latz (95 NYS2d 584, 590 [Sur Ct, Queens County 1950]), the decedent was indebted to his predeceased brother’s estate in the sum of $2,501.55 at the time of his death. His will bequeathed $2,501.55 to the decedent’s sister-in-law. The court held as follows:
“A legacy to a creditor will be deemed to be in satisfaction of the debt only where it is clear from the face of the will and the facts of the particular case that the testator so intended . . . There is no presumption that the legacy is or is not so intended. Were it not for the provision in this will that the brother’s widow was to receive ‘not less than’ the exact amount of the debt there would be no question that the legatee would be entitled to her legacy in addition to the debt. The will contains the usual provision for the payment of debts; the legatee individually is not the creditor; and the legacy is payable only after the deaths of the testator and his mother, although the debt was due and payable prior to the brother’s death in 1945. The testator, however, was aware that he owed his brother’s estate the exact amount of money he mentioned in the will, and that the legatee was his brother’s administratrix and sole distributee (the brother’s estate is substantially less than $5,000). He was making certain by *740 this provision that his brother’s widow would receive at least the amount of the indebtedness. Unless he intended the legacy to be in satisfaction of the debt there was no occasion to make any reference to the exact amount of the debt in his will. No other legacy is so qualified. The provision will not be rejected as surplusage where a reasonable interpretation will give it effect. There is no doubt that the testator had this debt in mind when he drew his will. It is therefore held that the legacy was intended to be in satisfaction of the debt to Robert C. Latz and his estate” (Matter of Latz, 945 NYS2d 584, 590 [1950] [citation omitted]; see also Matter of Pergament, 204 Misc 384 [1953] [$5,000 bequest in will was in satisfaction of obligation in antenuptial agreement that required decedent to pay wife the sum of $5,000 in discharge of any claims she might have]).
Respondents rely heavily on Matter of Friedman (146 Misc 2d 91 [1989]) in support of their argument that the decedent here intended the legacies to petitioners under his will to satisfy his obligations under the 1972 agreement. In Matter of Friedman, an “adopted-out” child of the decedent brought a construction proceeding seeking a determination of her rights under her biological father’s will and under a separation agreement between her natural parents. The separation agreement obligated the husband to make a will giving his child “a share of his estate not less than the child would receive if he died intestate” (id. at 93). The decedent died leaving a will which provided for $50,000 to his “former daughter” who was adopted with his consent. The will also included an in terrorem clause. The adopted-out daughter contended that she was to receive the $50,000 disposition under the will in addition to her intestate share. The court noted that the daughter had been “adopted out” seven years after the agreement and 32 years before the decedent’s death. The court held as follows:
“The general principle of law is that a legacy to a creditor is not a satisfaction of the debt unless the testator intended it to be . . . . Although testator’s intention may not be clear from the will itself (except in the in terrorem clause), it may be found by reading the will together with paragraph SEVENTH of the 1947 agreement. In that provision, Mr. Friedman agreed that if he made a will he would *741 leave Linda an amount not less than her share if he died intestate. From the terms of the two provisions, it may fairly be inferred that Mr. Friedman intended the $50,000 disposition to be in satisfaction of his debt to Linda. Under the circumstances of this case, any other conclusion is untenable. Linda is therefore not entitled to both the $50,000 disposition and her intestate share.” (Matter of Friedman, 146 Misc 2d 91, 96-97 [1989].)
Analysis
The sole issue before the court at this juncture is whether the petitioners are entitled to both their legacies under the decedent’s will and the Donative Property.
Here, the petitioners have demonstrated the following. The 1972 agreement obligated the decedent and Morton Beer to make certain provisions for the petitioners. Morton Beer’s will left his entire estate to the petitioners. The decedent left each of petitioners a $250,000 cash bequest in his will and provided that if they survived Kate, Mindy would receive 3.43% of the trust remainder and Robert would receive not only the 3.43% but also an additional 2%. Article first of the decedent’s will directed the payment of the decedent’s just debts. The decedent’s will did not affirmatively state that the bequests to petitioners were in satisfaction of his obligation under the 1972 agreement. The bequests in the will were conditioned on the petitioners surviving the decedent with respect to the cash bequest, and Kate with respect to the remainder interests. The 1972 agreement, however, provided that the decedent’s Donative Property would be bequeathed in equal shares to petitioners, or if they were not then living, to their issue. The attorney-draftsman of the decedent’s will had no knowledge of the 1972 agreement until after Kate’s death.
Based upon the foregoing, the petitioners have established prima facie that they are entitled to summary judgment as a matter of law.
The respondents have failed to present proof sufficient to raise a genuine issue of fact as to the decedent’s intention. The respondents have offered no evidence, other than mere speculation and conclusory statements, that the decedent intended the bequests to petitioners in his will to satisfy his obligation to bequeath his Donative Property to the petitioners under the 1972 agreement.
*742 In fact, the arguments raised by respondents do not address the issue of whether the decedent intended petitioners to take their testamentary bequests as well as their claim. Instead, respondents seemingly argue that petitioners’ claim is not a valid claim because either they received enough from the decedent during his lifetime or will receive enough under the decedent’s will or under the decedent’s and Kate’s wills viewed together. Respondents’ arguments, however, are unavailing because none of the points they raise bear on the question identified in Matter of Friedman, a case which respondents rest upon — specifically, did the decedent have the 1972 agreement in mind when he executed his will. Petitioners have made out a prima facie case that he did not; respondents have failed to raise a triable issue of fact to the contrary that he did.
Concerning the issue of whether the substitution clause was triggered by the 1998 transfer to Kate, if the 1998 transfer triggered the substitution provision, then pursuant to paragraph 1 (b) (ii) of the 1972 agreement, the decedent could substitute the value of the Donative Property as of the date of such disposition for the specific in-kind distribution of the Donative Property. The substitution clause is only relevant to the issue of whether the decedent intended the legacies to satisfy his obligation to the extent that respondents are attempting to show similarity in the amount of the testamentary bequests and the amount of the claim, one of the factors articulated by the courts to ascertain the testator’s intention.
Specifically, respondents argue that petitioners are not entitled to an in-kind distribution of 5% of the subject entities because the substitution clause was triggered by the 1998 transfer to Kate and, therefore, they are only entitled to the book value on the date of the transfer. The 1972 agreement provides that “[i]n the event the Donative Property, or any part thereof, shall have been sold, liquidated or otherwise disposed of during Sosnow’s lifetime . . . there shall be substituted in lieu thereof . . . the value thereof as of the date of such disposition — in the event of other disposition.” Respondents argue, therefore, that the decedent was entitled to satisfy his obligation to petitioners by a cash bequest in an amount equal to the book value of a 5% interest in the Birchwood entities as of the October 30, 1998 transfer date.
Whether the substitution clause was triggered requires a construction of the language in the 1972 agreement. Well-established tenets of contract construction must be applied to *743 determine whether the decedent’s transfer to Kate of one half of his 87% interest in 1998 triggered the substitution clause. “Where the intention of the parties may be gathered from the four corners of the instrument, interpretation of the contract is a question of law and no trial is necessary to determine the legal effect of the contract” (Matter of Friedman, 2009 NY Slip Op 31854[U], *24 [Sur Ct, Nassau County 2009]).
The Court of Appeals has stated that “[contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish” (Atwater & Co. v Panama R.R. Co., 246 NY 519, 524 [1927]).
“The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought” (Atwater & Co. v Panama R.R. Co., 246 NY 519, 524 [1927]).
“Generally, the aim is a practical interpretation of the expressions of the parties to the end that there be a realization of [their] reasonable expectations” (Brown Bros. Elec. Contrs. v Beam Constr. Corp., 41 NY2d 397, 400 [1977] [internal quotation marks omitted]). “Emphasis is not to be put on any single act, phrase or other expression, but instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain” (Brown Bros. Elec. Contrs. v Beam Constr. Corp., 41 NY2d 397, 400 [1977] [citations omitted]). “Since the intent of the parties in entering an agreement is a paramount consideration when construing a contract, even the actual words provided therein may be transplanted, supplied or entirely rejected to clarify the meaning of the contract” (Reape v New York News, 122 AD2d 29, 30 [2d Dept 1986]).
“It is the court’s duty sitting in equity, to attempt to get at the substance of things and to ascertain, uphold and enforce the rights and duties which spring from the real relations of the parties. It will never suffer the mere appearance and external form to cancel the true purpose, object and consequences *744 of a transaction” (Schwartz v Schwartz, 153 AD2d 935, 937 [2d Dept 1989]).
Moreover, courts can reject an absurd construction in favor of one which would better accord with the reasonable expectations of the parties (Reape v New York News, 122 AD2d 29 [2d Dept 1986]). In addition,
“[p]arties to an agreement are presumed to act sensibly . . . and an interpretation that produces an absurdly harsh result is to be avoided . . . [s]ince there exists, in every contract, an implied covenant of good faith and fair dealing, the courts may take into consideration the fact that one construction would make the contract unreasonable. Thus, courts will endeavor to give the construction most equitable to both parties instead of one which will give one of the parties an unfair or unreasonable advantage over the other” (Matter of Friedman, 64 AD2d 70, 82 [2d Dept 1978] [citations and internal quotation marks omitted]).
The 1972 agreement specifically sets forth the intent of the parties: “Beer has two children, Mindy Gail Beer and Robert Norman Beer. Said children are the grandchildren of Sosnow. The parties desire to make certain dispositions for the benefit of said children.” Thus, the intention of the parties was to provide for Morton Beer’s children, the petitioners. Roger Stern, Morton Beer’s attorney, testified at his deposition that the concept of the 1972 agreement was that the decedent
“wanted to get it back but he agreed and the agreement was that if he sold the business or one thing or another, that then it would be put into trust. In other words, it would ultimately go to the children but he was not going to give it to the children now. He wanted it back.”
Under respondents’ view of the substitution clause, one day after the 1972 agreement was executed, the decedent could have transferred one share of the Birchwood entities and the substitution clause would have been triggered even though he retained more than 5% of the Birchwood entities. Such an interpretation is inconsistent with the parties’ intention to provide for the petitioners. Here, the decedent transferred by gift one half of his 87% interest in Birchwood Associates to Kate, presumably for estate planning purposes. The document evidencing the transfer to Kate, in fact, refers only to “Birchwood Associates” not National Birchwood Corporation or MS Associates, *745 which constitute part of the decedent’s Donative Property under the 1972 agreement. Pursuant to the language of the 1972 agreement, the decedent had to sell, liquidate or otherwise dispose of his “Donative Property” — which was defined as 5% of the subject entities he was obligated to bequeath — to trigger the substitution clause. Significantly, even after the 1998 transfer, the decedent retained a 43.5% interest, substantially more than the 5% identified as his Donative Property. The court also notes that the transfer was to the decedent’s spouse, Kate, whom respondents argue operated as a single unit with the decedent. Based upon the language and articulated purpose of the 1972 agreement and the rules of contractual construction articulated above, the 1998 transfer to Kate does not trigger the substitution clause.
Concerning the issue of partial performance, respondents argue that the testamentary bequests in the decedent’s will should count, in any event, towards the decedent’s obligation. The partial performance argument simply begs the question of the decedent’s intent. As stated above, the respondents have offered no evidence that the decedent intended the legacies to wholly or partially satisfy the claim. Accordingly, the partial performance argument is meritless.
The TIC Properties
The partners of Birchwood entered into the tenants-in-common (TIC) agreement in 1984, in which they agreed that Birchwood would assign to them, for no value, various assets of the partnership, including the shares of stock and related proprietary lease allocable to six cooperative apartments. In accordance with the agreement, the TIC properties were to be assigned from Birchwood to its owners/partners in proportion to their ownership interest in Birchwood. Petitioners claim, therefore, that they are entitled to 5% of the TIC properties. According to petitioners, respondents have refused to provide various documents requested by the petitioners concerning the TIC agreement and properties.
Respondents have not briefed the TIC property issue, but instead address the second branch of petitioners’ motion in a footnote. Respondents claim that petitioners have raised the TIC property issue prematurely and that the issue is “probably moot and wholly without merit.” According to respondents, petitioners agreed to a compromise on document discovery for certain of the TIC properties with the understanding that they *746 were free to come back to seek additional TIC documents, if needed, after reviewing what respondents produced under the compromise. Respondents claim that petitioners never came back formally or informally to ask for additional TIC documents, but instead moved for summary judgment, in violation of the compromise. By doing so, respondents claim that they have been denied the opportunity to complete the record by taking depositions concerning TIC issues. Respondents assert that the court should have the benefit of a full record of documents and deposition testimony from knowledgeable witnesses. In addition, respondents contend that the question of whether the TIC properties should be treated as “Donative Properties” may be moot since all of the decedent’s individual interests in the TIC properties were included in his residuary estate.
The court agrees with respondents that the branch of petitioners’ motion seeking summary judgment on the petitioners’ entitlement to 5% of the TIC properties is premature. Accordingly, that branch of petitioners’ motion is denied.
The petitioners’ motion for summary judgment is granted to the extent that petitioners’ claim is valid and enforceable.